IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

RICK ORTIZ and
YSRAEL CASTILLO,

      Plaintiffs,

vs.

                         No. CIV 06-1141 LCS/CG

MANAGEMENT & TRAINING
CORPORATION,

      Defendant.

## MEMORANDUM ORDER AND OPINION

**THIS MATTER** comes before the Court on Defendant's motions for summary judgment filed August 21, 2007.  (Docs. 59-62.)  Also before the Court is Defendant's Motion to Limit Plaintiff Castillo's Potential Damages Recovery filed September 19, 2007.  (Doc. 77.)  The Court, acting upon consent and designation pursuant to 28 U.S.C. § 636(c), and having reviewed the motions and considered the arguments and submissions of counsel, relevant authorities, and being otherwise fully advised, finds: Defendant's Motion for Summary Judgment on Plaintiff Castillo's Title VII Claim (Doc. 59) should be **GRANTED**; Defendant's Motion for Summary Judgment on Plaintiff Ortiz's Title VII Claim (Doc. 60) should be **GRANTED**; Defendant's Motion for Summary Judgment on Plaintiffs' Intentional Torts Claims (Doc. 61) should be **GRANTED**.  Defendant's other motions (Docs. 62, 77) are moot.

## I.      FACTS

The following statement of facts is set forth in the light most favorable to

Plaintiffs with all reasonable inferences from the record drawn in their favor.  *See*

*Clanton v. Cooper*, 129 F.3d 1147, 1150 (10th Cir.1997).

Plaintiffs Castillo and Ortiz worked as detention center officers at Otero County

Prison Facility ("the Prison"), a high security prison in New Mexico owned by

Defendant.  (Position Description signed by Castillo, Def. Ex. A. Doc. 59; Position

Description signed by Ortiz, Def. Ex. N. Doc. 60.)  Before working for the Prison,

Plaintiff Castillo served in the Marines as a combat engineer, and also participated in

ultimate fighting for five years at Lion's Den Submission Fighting.  (Castillo Dep. at 15-

16, 56-57, Def. Ex. C. Doc. 59.)  Plaintiff Ortiz was previously a maximum security

corrections officer for the Texas Department of Criminal Justice.  (Ortiz Dep. at 59-61,

Def. Ex. O. Doc. 60.)

The prison has a zero-tolerance harassment policy with a specific grievance

procedure for reporting incidents.  (MTC Policy, Def. Ex. D. Doc. 59.)  Both Plaintiffs

received a copy of this policy when they were hired.  (Policy signed by Ortiz, Def. Ex. P.

Doc. 60; Policy signed by Castillo, Def. Ex. E. Doc. 59.)

On April 6, 2006, Plaintiffs tried out to become members of the Prison's

Emergency Response Team ("ERT") along with a third officer, Mr. Vasquez.  (Ortiz

Dep. at 82, Def. Ex. F. Doc. 59.)  The ERT responds to emergency and riot situations in

the prison, and the tryout consisted of running, sit-ups, and pushups.  *Id*. at 80, 86.  After

successfully completing these activities, the officers participated in a "60-second"

2

initiation drill.  (Lopez Dep. at 46, Def. Ex. G. Doc. 59.)  In this "survivability" drill, one officer kneels on his hands and knees, and a second officer grabs him by the chest in a hold similar to those used by high school wrestlers.  (Conner Memo, Def. Ex. J. Doc. 59; Lopez Dep. at 43-44, Def. Ex. G. Doc. 59.)  The first officer then has sixty seconds to turn around without breaking the hold or standing up, and will be sprayed in the face with pepper spray if he attempts to do either.  (Castillo Dep. at 90, Pl. Ex. C. Doc. 73.)  Other officers present surround the two participants and watch.  *Id*. at 99.  New ERT hires are required to complete the drill with each member of the team before they are considered full members themselves.  (Conner Memo, Def. Ex. J. Doc. 59.)  No protective equipment is used (Lopez Dep. at 43, Def. Ex. G. Doc. 59), but participants can stop at any time and are continually asked if they want to quit (Conner Memo, Def. Ex. J. Doc. 59).  The pepper spray is used because it is an element that officers could encounter during a riot.  (Ortiz Dep. at 96, Def. Ex. F. Doc. 59.)

      After watching two officers demonstrate the drill, Plaintiff Ortiz volunteered to go first.  (Ortiz Dep. at 108-09, Def. Ex. 0. Doc. 60.)  During his first session, Plaintiff Ortiz was sprayed in the face with pepper spray from approximately four feet away by Lieutenant Lopez, the supervisor in charge of the drill.  *Id*. at 109-10.  In another session, he was choked and body slammed multiple times by Officer Estaban Reza, who broke the rules by standing up during the drill.  (Ortiz Dep. at 9-15, Pl. Ex. B. Doc. 73.)  As this occurred, Plaintiff Ortiz attempted to tell him to stop but was not heard by any of the officers.  (*Id*. at 15; Conner Memo, Def. Ex. J. Doc. 59.)  Then, during his session with Officer Christina Ramos, someone called out, "dry hump him."  (Conner Memo, Def. Ex.

J. Doc. 59.)  She then simulated humping Plaintiff Ortiz from behind for no more than seven seconds, and was encouraged by Lieutenant Lopez, who told her to "tell him how you like it."  (Ortiz Dep. at 33-35, Def. Ex. R. Doc. 60; Ortiz Dep. at 47-48, Pl. Ex. B. Doc. 73.)  Other officers laughed at this, and thought that Plaintiff Ortiz was laughing too.  (Ortiz Dep. at 35-36, Def. Ex. R. Doc. 60; Conner Memo, Def. Ex. J. Doc. 59.)  In all, Plaintiff Ortiz completed four to six sixty second sessions before stopping because he had aggravated an existing ankle injury and believed  that the other officers were being hard on him.  (Ortiz Dep. at 32, 73, Def. Ex. R. Doc. 60.)  The ankle injury was not serious and seemed to heal overnight.  *Id*. at 75.  Plaintiff Ortiz was also bruised and cut during the training.  (Williams Memo, Def. Ex. U. Doc. 60.)

When it was Plaintiff Castillo's turn, he completed the drill with approximately half of the officers present before requesting to stop.  (Castillo Dep. at 98-99, Def. Ex. C. Doc. 59.)  He was permitted to rest for two minutes, then decided to continue.  *Id*. at 98. During subsequent sessions, he was elbowed, head-butted, and choked until he lost consciousness.  (Castillo Dep. at 104, 161, Pl. Ex. C. Doc. 73.)  At one point, he broke a hold and was sprayed in the face with pepper spray by Lieutenant Lopez.  *Id*. at 104-05. While he was performing the drill with Officer Reza, someone yelled, "dry-hump his ass!"  (Castillo Dep. at 101-02, Def. Ex. C. Doc. 59.)  Officer Reza proceeded to do so, and also taunted Plaintiff Castillo.  *Id*. at 102.  The incident lasted a couple of seconds. *Id*.  After that session, Plaintiff Castillo again attempted to quit, but was dissuaded by some of the other officers.  *Id*. at 103.  They pointed out that he was almost finished, and

Plaintiff Castillo continued the drill.  *Id*.  In the days that followed, another officer remarked to Plaintiff Castillo that he had heard about the dry-humping.  *Id*. at 111.

Plaintiff Ortiz returned to work for three days after the April 6, 2006 ERT tryout. (Ortiz Dep. at 38, Def. Ex. R. Doc. 60.)  During that time, he was "babied" by Sergeant Monroe, who kept asking Plaintiff Ortiz how he was doing and assigned him to the picket instead of the dorms.  *Id*. at 73-74.  Also during that time, another officer at one point told Plaintiff Ortiz to hurry up and open a door or "I'll kick your ass like the ERT team." *Id*. at 80.  When Plaintiff Ortiz met with Lieutenant Bowen to discuss his monthly evaluation on April 7, 2007, she mentioned that she had heard that he "got his ass beat yesterday."  *Id*. at 81-82.

On April 11, 2006, Plaintiff Ortiz sent the Prison a facsimile stating that he (1) had been assaulted and sexually assaulted by Officer Miranda, and injured physically and mentally at the ERT training, (2) would be pursuing a worker's compensation claim and sexual harassment claim, and (3) would not be returning to work because he was injured and also feared for his life.  (Ortiz Facsimile, Def. Ex. S. Doc. 60.)  The next day, Plaintiff Ortiz submitted a letter from his psychologist advising him to discontinue work for medical reasons until further notice.  (Feldman Letter, Def. Ex. V. Doc. 60.)  Plaintiff Ortiz has not returned since, and continues to receive workers' compensation benefits. (Ortiz Dep. at 41-42, Def. Ex. R. Doc. 60.)

The Prison initiated an investigation into the alleged sexual assault on April 12, 2006, and, during the next two weeks, all employees and supervisors who were present at the incident were interviewed.  (Frawner Memo, Def. Ex. J. Doc. 59.)  On April 12, 2006

and April 17, 2006, Margarita Williams, the Prison's Human Resources Manager, contacted Plaintiff Ortiz to clarify his allegations.  *Id.*  During these conversations, Ms. Williams asked Plaintiff Ortiz if he knew what "ERT" stood for, and the tone of her voice made him feel like a coward.  (Ortiz Dep. at 40, Def. Ex. R. Doc. 60.)  On April 18, 2006, Warden Frawner met with Plaintiff Castillo to discuss Plaintiff Ortiz's allegations, and was informed for the first time that Plaintiff Castillo had been dry-humped as well. (Castillo Dep. at 131-33, Def. Ex. C. Doc. 59.)

Based on the results of its investigation, the Prison concluded that someone did yell "hump him!" during Plaintiff Ortiz's session with Officer Ramos, and that she did simulate humping him for a few seconds.  (Frawner Memo, Def. Ex. J. Doc. 59.)   On April 24, 2006, Officer Ramos was terminated, and three supervisors present during the drill were suspended for failing to take action.  (Termination and Suspension Notices, Def. Ex. L. Doc. 59.)  In addition, the Prison changed the structure of its ERT tryout and training, requiring more involvement from its Training Manager and Fire and Safety Personnel, requiring written and oral exams, and building a sand pit for the sixty-second drills.  (Frawner Dep. at 126-27, Def. Ex. B. Doc. 59.)  The following claims could not be substantiated: that Lieutenant Lopez encouraged Officer Ramos; that Plaintiff Ortiz was humped by Officer Mirandez; that Plaintiff Ortiz was sprayed in the face with pepper spray; that Plaintiff Castillo was humped by Officer Reza.  (*Id*. at 96; Frawner Memo, Def. Ex. J. Doc. 59.)

In the days following Plaintiff Castillo's conversation with Warden Frawner, a fellow officer told him that he had heard that the two had talked, and that Plaintiff

Castillo needed to be careful.  (Castillo Dep. at 138-39, Def. Ex. C. Doc. 59.)  Also,

certain officers that had previously been friendly with Plaintiff Castillo stopped calling

him.  *Id*. at 140-41.  Plaintiff Castillo did not report either of these developments.  *Id*. at

141.

On April 30, 2006, Plaintiff Castillo sent the Prison a letter stating that he (1) had

been assaulted and sexually assaulted by Officer Reza, and injured physically and

mentally at the ERT training, (2) would be pursuing a worker's compensation claim and

sexual harassment claim, and (3) would not be returning to work because he was injured

and also feared for his life.  (Castillo Letter, Def. Ex. M. Doc. 59.)  Plaintiff Castillo did

not return to work after that, and subsequently received workers' compensation benefits

for injuries suffered at the ERT training.  (Castillo Dep. at 12-13, Def. Ex. C. Doc. 59.)

Both he and Plaintiff Ortiz have since been diagnosed with Post-Traumatic Stress

Disorder ("PTSD"), and went to physical therapy for their injuries.   (Feldman Dep., Def.

Ex. Y. Doc. 61; Ortiz Aff. ¶ 11, Pl. Ex. K. Doc. 73; Castillo Aff. ¶ 12, Pl. Ex. K. Doc.

73.)

On October 23, 2006, Plaintiffs filed suit against Defendant in the Third Judicial

District Court of the State of New Mexico.  First, Plaintiffs allege that they were

subjected to sexual discrimination, a hostile work environment, and constructive

discharge in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. § 2000e.  (Doc. 1.)  Second, Plaintiffs claim that the acts of their co-workers

amounted to intentional infliction of emotional distress, outrage, assault, and battery, and

that Defendant is vicariously liable under the doctrine of *respondeat superior*.  *Id*.
Defendant removed the case to this Court on November 22, 2006.  *Id*.

On August 21, 2007, Defendant filed four motions for summary judgment: on Plaintiffs' Title VII claims (Docs. 59, 60), on Plaintiffs' intentional tort claims (Doc. 61), and on Plaintiffs' punitive damages claims (Doc. 62).  In support of the first two, Defendant argues that (1) plaintiffs' allegations do not rise to the level of a hostile work environment, (2) the alleged harassing behavior was not based on sex, (3) Plaintiffs' allegations do not rise to the level of constructive discharge, and (4) DMC is not liable for any alleged harassment because both plaintiffs failed to fully take advantage of its remedial scheme.  (Docs. 59, 60.)  In support of the third, Defendant maintains that Plaintiffs' intentional tort claims are barred by the New Mexico Workers Compensation Act, that it is not liable for any intentional tort, and that the acts of its employees did not rise to the level of intentional infliction of emotional distress.  (Doc. 61.)  In support of the fourth, Defendant asserts that the facts alleged cannot sustain an award of punitive damages.  (Doc. 62)  On September 17, 2007, Plaintiffs filed objections to the evidence Defendant submitted in support these motions, claiming that two of the exhibits are hearsay.  (Doc 74.)  Plaintiff Ortiz's response to Defendant's motion for summary judgment on his Title VII claim, filed September 17, 2007, also states an objection to Exhibit U as hearsay.  (Doc. 70.)

On September 19, 2007, Defendant filed a motion to limit Plaintiff Castillo's potential damages recovery, arguing that damages should be capped because Plaintiff Castillo falsified certain documents.  (Doc. 77.)

## II.   OBJECTIONS TO DEFENDANT'S EVIDENCE

As a preliminary matter, the Court will consider the objections to Exhibits I, K, and U.[1]  (Docs. 70, 74).  Both Plaintiffs assert that Exhibits I and K, a memorandum from Plaintiff Castillo and memoranda from prison officials, are hearsay and should not be considered at this point.  (Doc. 74).  In addition, Plaintiff Ortiz claims that Exhibit U, a memorandum from Margarita Williams, is hearsay as well.  (Doc.70.)  Defendant counters that Exhibit I is not hearsay because it is an admission of a party opponent, and that Exhibits I, K and U are admissible as properly authenticated business records.  (Doc. 84.)

A statement is not hearsay if it is offered against a party and is that party's own statement.  FED. R. EVID. 801(d).  Exhibit I is offered against Plaintiffs and is Plaintiff Castillo's own statement.  (Castillo Memo, Def. Ex. I. Doc. 59-3)  Thus, it is admissible as non-hearsay.  *Id.*

Business records which would normally be admissible at trial under Rules 803(6) of the Federal Rules of Evidence may also be considered along with a motion for summary judgment.  *Farmers Alliance Mut. Ins. Co. v. Naylor*, 452 F. Supp. 2d 1167, 1177 (D.N.M. 2006).   To be admissible under Rule 803(6), the records must be accompanied by the testimony of a custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification.  FED. R. EVID. 803(6).  Testimony of a custodian or other qualified witness did not accompany Exhibits K or Exhibit U, nor did any form of certification.  (Docs. 59,

---

[1]Although the Court will address these objections, its opinion relies on none of the evidence in question.

60.)  And although Defendant later submitted testimony along with its response to

Plaintiffs' objections, this testimony did not accompany the exhibits.  (Docs. 59, 84.)

Exhibits K and U, therefore, are not admissible under Rule 803(6) and may not be

considered in Defendant's motions for summary judgment.  *See* FED. R. EVID. 803(6)*;*

*Farmers Alliance*, 452 F. Supp. 2d at 1177.

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits  . . . show that there is

no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  FED. R. CIV. P. 56(c).  When applying this standard, the

Court examines the record and reasonable inferences "in the light most favorable to the

nonmoving party."  *See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance*

*Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999) (citation omitted).

Generally, the Movant bears the initial burden of establishing that no genuine

issue exists as to any material fact.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157

(1970) (citation omitted).  "Where the record taken as a whole could not lead a rational

trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Scott*

*v. Harris*, 127 S. Ct. 1769, 1776 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986)).  The Movant's initial burden may be discharged

by showing "there is an absence of evidence to support the non-moving party's case."

*Celotex v. Catrett*, 477 U.S. 317, 325 (1986).  Once the Movant meets its burden, the

burden shifts to the non-moving party to demonstrate that there is a genuine issue for trial on a material matter.  *See Simms*, 165 F.3d at 1326 (citation omitted).

## IV.     DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT ON PLAINTIFFS' TITLE VII CLAIMS

### A.     Whether Plaintiffs can establish a hostile work environment based on sexual discrimination

Title VII prohibits an employer from discriminating against any individual with respect to the compensation, terms, or privileges of employment on the basis of sex.  *See* 42 U.S.C. § 2000e-2(a)(1).  "'A plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment.'" *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (*citing Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986)).  To prevail on a hostile work environment claim, a plaintiff must show that under the totality of the circumstances: (1) the discriminatory conduct was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the victim was targeted because of her gender.  *Equal Employment Opportunity Comm'n v. PVNF, L.L.C.*, 487 F.3d 790, 798 (10th Cir. 2007).

## HOSTILE WORK ENVIRONMENT

"'For a hostile work environment claim to survive a summary judgment motion, a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *MacKenzie v. Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005) (*quoting*

*Penry v. Fed. Home Loan of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998)).  Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the conditions of employment.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  The environment must be "'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'"  *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1219 (10th Cir. 2003) (*quoting Faragher*, 524 U.S. at 786).  The severity and pervasiveness analysis looks to all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether is unreasonably interferes with an employee's work performance."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *see also Jones v. Barnhart*, 349 F.3d 1260, 1268 (10th Cir. 2003).  Moreover, the analysis is "particularly unsuited for summary judgment because it is quintessentially a question of fact."  *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999) (quotation omitted); *see also PVNF*, 487 F.3d at 798.

Plaintiffs' hostile work environment claim is based on the following evidence.  Plaintiffs were each dry-humped from behind by a co-worker for less than seven seconds on one occasion.  (Ortiz Dep. at 33-35, Def. Ex. R. Doc. 60; Castillo Dep. at 102, Def. Ex. C. Doc. 59.)  Each incident occurred at the suggestion of an officer other than the harasser during a training drill that pitted officer against officer as imaginary combatants.  (Conner Memo, Def. Ex. J. Doc. 59; Castillo Dep. at 90, 101-02, Def. Ex. C. Doc. 59.)  A number of Plaintiffs' co-workers and supervisors witnessed both incidents, and some

laughed in reaction.  (Ortiz Dep. at 35-36, Def. Ex. R. Doc. 60; Castillo Dep. at 102, Def.

Ex. C. Doc. 59.)  One of the supervisors encouraged Plaintiff Ortiz's harasser.  (Ortiz

Dep. at 47-48, Pl. Ex. B. Doc. 73.)

Because the conduct at issue occurred on only one occasion, the Court must

determine whether it was sufficiently severe to alter the terms of Plaintiffs' employment

and create a hostile work environment.  *PVNF*, 487 F.3d at 798 (conduct must be

"sufficiently pervasive *or* severe"); *see also Turnbull v. Topeka State Hosp.*, 255 F.3d

1238, 1243 (10th Cir. 2001) ("an isolated incident may suffice if the conduct is severe and

threatening").  Although all of the circumstances must be considered, and each case in

this area is factually unique, other cases provide a helpful comparison.  In *Turnbull v.*

*Topeka State Hospital*, the Tenth Circuit upheld a jury determination that a female

psychologist had been subjected to a hostile work environment after a male patient

"knocked her to the ground, undressed her and digitally penetrated her, bit and choked

her, and repeatedly threatened to kill her." 255 F.3d at 1242-43.  "While there was only

once incident," the court reasoned, "it was objectively abusive, dangerous, and

humiliating, and Dr. Turnbull was so traumatized she was unable to return to work

thereafter."  *Id*. at 1243-44.  Similarly, in *Lockhart v. Pizza Hut*, the Tenth Circuit

reversed the district court's grant of summary judgment, finding sufficient severity to

support a jury finding of hostile work environment when a male customer pulled a

female waitress by the hair, then grabbed her breast and put his mouth on it.  162 F.3d

1062, 1072 (10th Cir. 1998).  Likewise, in *Tomka v. Seiler Corp*., the Second Circuit

agreed with the district court that the terms of a female employee's employment were

sufficiently altered after she was raped by three male co-workers following a business dinner on one evening.  66 F.3d 1295, 1305 (2nd Cir. 1995).  On the opposite side of the spectrum are cases like *Creamer v. Laidlaw Transit*, where the Tenth Circuit affirmed the district court's judgment in favor of the Defendant following a bench trial.  86 F.3d 167, 169-70 (10th Cir. 1996).  Specifically, the court found that the asserted harassment was not sufficiently severe when a male co-worker kissed a female employee on cheek, then a few minutes later lifted her either by the waist or by the wrists onto the pool table and pinned her back against the pool table.  *Id*. ("This single incident does not, by any means, amount to . . . sexual harassment.").  Similarly, in *Lam v. Curators of the University of Missouri*, the Eighth Circuit held that a single exposure to an offensive video tape is not severe enough to create hostile work environment and affirmed the district court's grant of summary judgment in favor of the Defendant.  122 F.3d 654, 656-67 (8th Cir. 1997).  Likewise, in *Lowe v. Angelo's Italian Foods*, the Tenth Circuit found that one isolated comment and the use of the term "girlie" did not "demonstrate that the work environment … was permeated with discriminatory intimidation, ridicule, and insult," and upheld summary judgment in favor of the Defendant.  87 F.3d 1170, 1175 (10th Cir. 1996) (quotation omitted).

Considering the totality of circumstances, the Court finds that this case seems to fall into the category of cases where the alleged harassment is not severe enough to alter the terms of Plaintiffs' employment and create a hostile work environment.[2]  Unlike the

---

[2]In a case involving similar conduct, the United States District Court for the District of Delaware recently reached a similar conclusion.  *See Mongelli v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 491 F. Supp. 2d 467 (D. Del. 2007) (finding the "severe or pervasive" requirement unsatisfied when a special education teacher was, among other

victims in *Turnbull*, *Lockhart*, and *Tomka*, Plaintiffs were not undressed, groped, threatened, or forcefully penetrated.  *Turnbull*, 255 F.3d at 1242-43; *Lockhart*, 162 F.3d at1072; *Tomka*, 66 F.3d at 1305.  Instead, this case is more like *Creamer*, where the victim was briefly coerced into a compromising position by her harasser.  86 F.3d at 169. And while physical force was used, each incident occurred in the midst of a training drill similar to wrestling where physical contact with the harasser was not unexpected or unwelcome.  (Castillo Dep. at 90, Pl. Ex. C. Doc. 73.)

However, the Court also recognizes that the severity and pervasiveness evaluation is quintessentially a question of fact, and, therefore, particularly unsuited for summary judgment.[3]  *O'Shea*, 185 F.3d at 1098.  As a result, the Court is unwilling to find that a rational jury could not conclude that Plaintiffs were subject to harassment severe enough to alter the terms and conditions of their employment, and holds that Plaintiffs have presented evidence which may be sufficient to sustain a hostile work environment claim under Title VII.  *Creamer*,  86 F.3d at 169.

## DISCRIMINATION ON THE BASIS OF SEX

Title VII is not a general civility code for the workplace.  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998); *see also Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1182 (10th Cir. 2007).  "[I]f the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sexual

---

things, forcefully humped by one of her students after she had leaned over to help another student that was seated).

[3]Indeed, in many of the aforementioned cases, courts withheld judgment until after a jury or bench trial.  *See Creamer*, 86 F.3d at 169-70; *Turnbull*, 255 F.3d at 1243; *Lockhart*, 162 F.3d at1072.

discrimination as a result of that environment." *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1263 (10th Cir. 2005) (*quoting Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538 (10th Cir. 1994)).

Moreover, "workplace harassment is not 'automatically discrimination because of sex merely because the words used have sexual content or connotations.'" *Dick*, 397 F.3d at 1263 (quoting *Oncal*e, 523 U.S. at 80). "The critical issue ... is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not." *Oncale*, 523 U.S. at 80. In the hostile work environment context, an inference of discrimination because of sex can be drawn when: (1) the conduct at issue involved explicit or implicit proposals of sexual activity and (a) the harasser and the harassed employee are of opposite sexes, or (b) the harasser and the harassed employee are of the same sex and there is credible evidence that the harasser is homosexual, or (2) it is clear that the harasser is motivated by general hostility towards the presence of a specific gender in the workplace, or (3) the plaintiff offers proof that the harasser treats men and women differently in the workplace. *Dick*, 397 F.3d at 1263-64 (*citing Oncale*, 523 U.S. at 80).

In this case, Plaintiffs assert that the harassment was based on sex because simulating sex or rape is a way to dominate or humiliate a person, especially in a prison setting. (Docs. 70, 71.) As *Oncale* makes clear, however, harassment is not automatically on the basis of sex merely because the words or gestures used have sexual content or connotations. *Oncal*e, 523 U.S. at 80. Even if the harassers intended to

16

dominate or humiliate Plaintiffs in a sexual way, it would not be clear that Plaintiffs were discriminated against on the basis of sex. *Id*.

Moreover, the Court is unable to find that a rational juror could infer that Plaintiffs were targeted *because of their gender* by applying the evidentiary routes set out in *Oncale*. *Id*. The record does not contain any evidence that either harasser was motivated by a general hostility towards men in the workplace, or that either harasser treats men and women differently in the workplace. *Id*. Similarly, nothing in the record suggests that Plaintiff Castillo's harasser, officer Reza, is homosexual. Thus, the second and third evidentiary routes are inapplicable as to both Plaintiffs, and the first evidentiary route is inapplicable as to Plaintiff Castillo. *Id*. The question left for the Court is whether an act of dry-humping, as a matter of law, constitutes an implicit proposal of sexual activity. *Id*. The Court finds that it does not, and that here the record cannot support an inference that Plaintiff Ortiz's harasser was motivated by sexual desire. *Id*. In particular, the incident occurred in a group setting at the suggestion of other officers (Conner Memo, Def. Ex. J. Doc. 59; Castillo Dep. at 101-02, Def. Ex. C. Doc. 59), and on no other occasion did Officer Ramos demonstrated any interest in pursuing a sexual relationship with Plaintiff Ortiz. Moreover, the very thing that allows an inference of discrimination on the basis of sex when there is a proposal of sexual activity between members of the same sex, that it would be reasonable to assume that the proposal would not have been made to someone of the same sex, does not appear to apply in this case. *Oncal*e, 523 U.S. at 80. Shortly after a female officer dry-humped Plaintiff Ortiz at

someone else's suggestion, a male officer did the same to Plaintiff Castillo.  (Ortiz Dep. at 33-35, Def. Ex. R. Doc. 60; Castillo Dep. at 101-02, Def. Ex. C. Doc. 59.)

In sum, the facts, when taken together and in the light most favorable to Plaintiffs, may reasonably support a finding that the discriminatory conduct was pervasive or severe enough to alter the terms, conditions, or privilege of employment, but *not* a finding that Plaintiffs were targeted because of their gender.  *PVNF*, 487 F.3d at 798.  Defendant is entitled to summary judgment on Plaintiffs' hostile work environment claims.  *Scott*, 127 S. Ct. at 1776.

### B.       Whether Plaintiffs can establish constructive discharge

"Constructive discharge occurs when the employer by *its illegal discriminatory acts* has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign."  *PVNF*, 487 F.3d at 805 (quoting *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1175 (10th Cir. 2005)) (emphasis added).  In determining whether the employee's working conditions would cause such a feeling in a reasonable person, the Court must apply an objective test "under which neither the employee's subjective views of the situation, nor her employer's subjective intent with regard to discharging her, are relevant."  *Tran v. Trs. of State Colls. In Colo.*, 355 F.3d 1263, 1270 (10th Cir. 2004).  "The question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions."  *Id.*  Accordingly, "[t]he bar is quite high in such cases."  *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005) (quotation omitted).  A plaintiff must show that the working conditions imposed by the employer

18

are not only tangible or adverse, but intolerable.  *Tran*, 355 F.3d at 1270; *see also PVNF*, 487 F.3d at 805.

In support of their constructive discharge claim, Plaintiffs refer back to the aforementioned evidence of harassment.  In addition, Plaintiffs claim that their lives would have been in danger if they had returned to work after reporting the harassment.[4] (Docs. 70, 71.)  As more fully discussed *supra*, it is not necessary to resolve this issue because Plaintiffs were not subject to a hostile work environment based on sexual discrimination.  *Bolden v. PRC, Inc.*, 43 F.3d 545, 552 (10th Cir. 1994) (holding that a plaintiff has an actionable claim of constructive discharge pursuant to Title VII only when her resignation was the result of illegal discriminatory conduct); *see also Russell v. Midwest-Werner & Pfleiderer*, 949 F. Supp. 792, 800-01 (D. Kan. 1996) ("The plaintiff must also show that the employer's illegal discriminatory conduct caused the intolerable work conditions.").

### C.    Whether Defendant can be held liable for the alleged harassment

Employers are not always automatically liable under Title VII for discriminatory environments created by their supervisors.  *Faragher*, 524 U.S. at 792.  In *Faragher*, the Court delineated two categories of hostile work environment cases: "(1) harassment that culminates in a tangible employment action, for which employers are strictly liable, and (2) harassment that takes place in the *absence* of a tangible employment action, to which employers may assert an affirmative defense."  *Pa. State Police v. Suders*, 542 U.S. 129, 142 (2004) (quotation omitted).

---

[4]The Court suspects that this charge might more appropriately support a claim of retaliation.  No such claim is alleged in the complaint.  (Doc. 1.)

> The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher*, 524 U.S. at 807; *see also Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).  A tangible employment action is one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, [or] reassignment with significantly different responsibilities."  *Pa. State Police*, 542 U.S. at 142 (quotation omitted).  When there has been a constructive discharge, an employer may avail itself to the *Faragher* affirmative defense only if a supervisor's official act has not precipitated the discharge.  *Id.* at 142.

An employer is entitled to judgment as a matter of law under the *Farragher* affirmative defense only if the evidence points one way and is susceptible to no reasonable inferences supporting the opposing party.  Failure to satisfy either prong of the defense will defeat summary judgment in favor of the employer.  *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1208 (10th Cir. 2000).  While proof that an employer promulgated an anti-harassment policy with a complaint procedure is not absolutely necessary in every instance, failure to have such a policy will make it difficult for an employer to prove that it exercised reasonable care to prevent and correct harassment.  *Faragher*. 524 U.S. at 807.

Here, Defendant asserts that it is not liable for the alleged harassment because it had in place an effective anti-harassment policy and promptly disciplined the offending employees, and because Plaintiffs resigned before these remedial measures could take effect.  (Docs. 59, 60.)  As more fully discussed *supra*, it is not necessary to resolve this issue because Plaintiffs were not subject to a hostile work environment based on sexual discrimination.

## V.   DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' INTENTIONAL TORTS CLAIMS

In support of its motion for summary judgment on Plaintiffs' intentional torts claims, Defendant maintains that (1) Plaintiffs' intentional tort claims are barred by the New Mexico Workers Compensation Act ("WCA"), (2) Defendant is not liable for any intentional tort that may have been committed by its employees, and (3) Plaintiffs have failed to demonstrate conduct by Defendant sufficient to create liability under the tort of intentional infliction of emotional distress.  (Doc. 61.)  New Mexico law applies to these supplemental claims.  *See BankOklahoma Mortgage Corp. v. Capital Title Co.*, 194 F. 3d 1089, 1103 (10th Cir.1999).

### A.   Whether Plaintiffs' intentional tort claims are barred by the WCA

"The WCA provides the exclusive remedy for workplace injuries where, at the time of the incident, (1) the employee has complied with the relevant insurance provisions; (2) the employee is performing service arising out of and in the course of his employment, and (3) the injury is proximately caused by an accident arising out of and in the course of employment." *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1211 (10th Cir. 2006); *see also* N.M. Stat Ann. § 52-1-9.  However, the WCA applies only to injuries caused by accident; when an employer willfully or intentionally injures a a worker, that employer loses the rights afforded by the WCA.  *Fuerschbach,* 439 F.3d at 1213.  "Willfulness renders a worker's injury non-accidental, and therefore outside the scope of the Act, when: (1) the worker or employer engages in an intentional act or omission, without just cause or excuse, that is reasonably expected to result in the injury suffered by the worker; (2) the worker or employer expects the intentional act

or omission to result in the injury, or has utterly disregarded the consequences; and (3) the intentional act or omission proximately causes the injury." *Delgado v. Phelps Dodge Chino, Inc.*, 34 P.3d 1148, 1156 (N.M. 2001) (finding willfulness where there was a combination of deadly conditions, disregard of easily implemented safety measures, lack of training or preparation, and denial of assistance to a worker who twice asked for help).

To survive a summary judgment motion, a plaintiff must "plead or present evidence that the employer met each of the three *Delgado* elements through acts that exemplify a comparable degree of egregiousness as the employer in *Delgado*." *Morales v. Reynolds*, 97 P.3d 612, 617 (N.M. Ct. App. 2004).  The bar is quite high in such cases, and "should eliminate many claims before trial." *Salazar v. Torres*, 158 P.3d 449, 453 (N.M. 2007).  For example, in *Morales v. Reynolds*, the plaintiff was injured while fixing a pump containing a toxic chemical when his protective gear, which was not the safest equipment available and had malfunctioned in the past, popped off.  97 P.3d at 613, 618.  The New Mexico Court of Appeals found that the plaintiff failed to meet this burden because there was "no indication that the employer knew or should have known that their actions were the equivalent of sending Morales into certain severe injury or death." *Id*. at 618.  Likewise, in *Dominguez v. Perovich Properties, Inc.*, the New Mexico Court of Appeals held that a comparable degree of egregiousness was not present when an employer intentionally fails to provide safety devices that it knows it is required to provide.  111 P.3d 721, 727 (N.M. Ct. App. 2005) (finding the plaintiff's *Delgado* burden unmet even though his employer, a gravel processing operation, did not have certain safety equipment, lacked a permit, and never gave directions or held safety meetings as required by law).  "The critical

measure," the court explained, "is whether the employer has, in a specific dangerous circumstance, required the employee to perform a task where the employer is or should clearly be aware that there is a substantial likelihood the employee will suffer injury or death by performing the task." *Id*.

After examining the record, the Court fails to find the level of egregiousness required by *Delgado*. 34 P.3d at 1156. In particular, the evidence is insufficient to support a finding that Defendant required either Plaintiff to perform a task where it knew or should have known that Plaintiffs would suffer injury or death by performing the task. *Domniguez*, 111 P.3d at 727.

First, having Plaintiffs participate in the sixty second drill was hardly the equivalent of sending them into certain injury. *Morales*, 97 P.3d at 618. Although Plaintiff Castillo was told that anything goes (Castillo Dep. at 104, Pl. Ex. C. Doc. 73), participants are instructed not to stand or strike each other, and may quit at any time (Castillo Dep. at 90, Pl. Ex. C. Doc. 73; Lopez Dep. at 44, Def. Ex. G. Doc. 59; Conner Memo, Def. Ex. J. Doc. 59). Moreover, the drill is regularly included in ERT practices (Conner Memo, Def. Ex. J. Doc. 59), and there is no evidence that officers have been injured in the past. Further, even if Defendant failed to provide reasonable safety equipment or instruction, "such disregard ... does not permit a conclusion that the employer has specifically and willfully caused the employee to enter harm's way as contemplated by *Delgado*." *Dominguez*, 111 P.3d at 727. While it may have been foreseeable that during the drill one officer might negligently injured by another, such foreseeability does not rise to the level contemplated by *Delgado*. *Id*.

23

Second, neither Plaintiff was required by Defendant to participate in the 60-second drill. Unlike the employee in *Delgado* whose requests for help were twice rebuffed by an employer that insisted he perform a particularly dangerous task on his own, Plaintiffs voluntarily took part in the ERT activities and were told that they could stop any time. *Delgado*, 34 P.3d at 1151; (Conner Memo, Def. Ex. J. Doc. 59.)  In fact, Plaintiff Castillo did stop twice, then decided to continue the drill.  (Castillo Dep. at 98-99, 103, Def. Ex. C. Doc. 59.)  Likewise, Plaintiff Ortiz was permitted to stop when the other officers realized that he did not want to continue.  (Ortiz Dep. at 73, Def. Ex. R. Doc. 60; Ortiz Dep. at 35-36, Pl. Ex. B. Doc. 73.)  Moreover, ERT membership itself was optional.  (Ortiz Dep. at 80-82, Def. Ex. F. Doc. 59.)

**B.    Whether Defendant can be liable for the intentional torts of its employees**

In most instances, an employer is not liable for an employee's intentional torts because "an employee who intentionally injures another individual is generally considered to be acting outside the scope of his employment. "*Ocana v. Am. Furniture Co.*, 91 P.3d 58, 70-71 (N.M. 2004.)  Traditionally, New Mexico courts have held that the intentional act of the employee does not become the act of the employer unless the employer expressly authorized, commanded, or committed the act itself.  *See, e.g., Martin-Martinez v. 6001, Inc.*, 968 P.2d 1182, 1186 (N.M. App. 1998); *Gallegos v. Chastain*, 624 P.2d 60, 623 (N.M. App. 1981).  Recently, however, the Supreme Court of New Mexico found that an employer may also be held liable for the intentional torts of an employee acting outside the scope of her employment when "the employee was aided in accomplishing the tort by the existence of the agency relation." *Ocana*, 91 P.3d at 71 (quotation omitted).

Here, there is no evidence that Defendant expressly authorized, commanded, or committed itself the alleged assault, battery, or infliction of emotional distress. Assuming that the offending officers were acting outside the scope of their employment, Defendant would not be liable for those acts under the traditional rule. *Martin-Martinez,* 968 P.2d 1186. *Martin-Martinez,* 968 P.2d 1186. The more difficult issue is whether, under the new rule, Defendant's employees were aided in accomplishing the alleged torts by the existence of an agency relationship. *Ocana*, 91 P.3d at 71. The Court need not resolve it at this time though, because, as discussed *supra*, Plaintiff's intentional tort claims are barred by the WCA.

**C.      Whether Plaintiffs can establish intentional infliction of emotional distress**

In order to establish a claim of intentional infliction of emotional distress, a plaintiff must show: (1) the conduct in question was extreme or outrageous; (2) the conduct of the defendant was intentional or in reckless disregard of the plaintiff; (3) the plaintiff's mental distress was extreme and severe; and (4) there is a causal connection between the defendant's conduct and the claimant's mental distress. *Trujillo v. Northern Rio Arriba Elec. Coop., Inc.*, 41 P.3d 333, 342 (N.M. 2001); *see also, Wilcox v. Homestake Mining Co.*, 401 F. Supp. 2d 1196, 1201 (10th Cir. 2005). Failure to satisfy any of these elements will defeat the claim. *Trujillo,* 41 P.3d at 343.

As a threshold matter, the Court  must determine whether the conduct at issue may reasonably be regarded as so extreme and outrageous that it will permit recovery under the tort of intentional infliction of emotional distress. *Padwa v. Hadley*, 981 P.2d 1234, 1237 (N.M. App. 1999); *see also Alvarado v. KOB-TV, LLC* 493 F.3d 1210, 1222 (10th Cir. 2007). To qualify under the standard for establishing intentional infliction of emotional distress, the

recitation of the underlying facts to an average member of the community must arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"  *Padwa*, 981 P.2d at 1237. The conduct must be so extreme in degree as to "'go beyond all possible bounds of decency, and be regarded as atrocious and utterly intolerable in a civilized community.'"  *Rodriguez v. America Online, Inc.*, 183 F. Supp. 2d 1340, 1358 (D.N.M. 2001) (quoting *Dominguez v. Stone*, 638 P.2d 423, 426 (Ct. App. 1981)).

The Court has accepted all well-supported factual allegations as true and construed them in the light most favorable to Plaintiff.  *Simms*, 165 F.3d 1321, 1326.  However, the proffered evidence does not tend to show that the conduct of the other officers was so outrageous as to "go beyond all possible bounds of decency, and be regarded as atrocious and utterly intolerable in a civilized community."  *Dominguez*, 638 P.2d at 426.  Consequently, their actions, while highly offensive, do not rise to the level necessary to permit recovery under the tort of intentional infliction of emotional distress.  *Id*.  Assuming, *arguendo*, that Plaintiffs' intentional torts claims were not barred by the WCA, Defendant would nonetheless be entitled to summary judgment on Plaintiffs' claim for intentional infliction of emotional distress.  FED. R. CIV. P. 56(c).

## VI.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' PUNITIVE DAMAGES CLAIMS

New Mexico law permits an award of punitive damages where a defendant's conduct is malicious, willful, reckless, wanton, fraudulent, or in bad faith.  *Sloan v. State Farm Mut. Auto. Ins. Co.*, 320 F.3d 1073, 1075 (10th Cir. 2003); *see also*, N.M. U.J.I. Civ. 13-1827.  An employer may be held vicariously liable for the acts of an employee when: (1) the employee was acting

within the scope of her employment and had sufficient discretionary or policy-making authority

to speak and act for the employer with regard to the conduct at issue, independently of higher

authority, or (2) the employer has in some way authorized, ratified, or participated in the

employee's actions.  N.M. U.J.I. Civ. 13-1827; *see also Albuquerque Concrete Coring Co. v.*

*Pan Am World Servs.*, 879 P.2d 772, 775 (N.M. 1994).

   In Title VII actions, punitive damages are available only if an employer engaged in

intentional discrimination "with malice or with reckless indifference to the federally protected

rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1); *see also Kolstad v. American*

*Dental Ass'n*, 527 U.S. 526, 548 (1999).  They are unavailable when an employee's challenged

actions "were contrary to the employer's good-faith effort to comply with Title VII."  *Harsco*

*Corp v. Renner*, 475 F.3d 1179, 1189 (10th Cir. 2007).

   Here, Defendant asserts that Plaintiffs cannot recover punitive damages because: (1) the

acts of its employees were not malicious, willful, reckless, wanton, fraudulent, or in bad faith,

and, even if they were, none of those employees had sufficient policy-making authority and

Defendant did not authorize their actions, and (2) Defendant had made a good-faith effort to

comply with Title VII.  (Docs. 62, 83.)  In response, Plaintiffs maintain that they are entitled to

punitive damages "for all the reasons stated ... in their prior briefs."  (Doc. 72.)  As more fully

discussed *supra*, it is not necessary to resolve this issue because Plaintiffs were not subject to

sexual discrimination in violation of Title VII, and because their intentional tort claims against

Defendant are barred by the WCA.

**VII.    DEFENDANT'S MOTION TO LIMIT PLAINTIFF CASTILLO'S**

**POTENTIAL DAMAGES RECOVERY**

In support of its motion to limit Plaintiff Castillo's potential damages, Defendant argues that Plaintiff Castillo's potential recovery should be limited because he failed to disclose certain information when applying for a position with the Prison.  (Doc. 77.)  Again, it is not necessary to resolve this issue because Plaintiffs were not subject to sexual discrimination in violation of Title VII, and because their intentional tort claims against Defendant are barred by the WCA.

**VIII.   CONCLUSION**

After reviewing all of the evidence and construing all inferences in favor of Plaintiffs, the Court finds that Defendant's motions for summary judgment on Plaintiffs' Title VII claims and intentional torts claims (Docs. 59-61) should be **GRANTED**.  Summary judgment is appropriate on Plaintiffs' Title VII claims because  the record cannot reasonably support a finding that Plaintiffs were targeted because of their gender.  Summary judgment is appropriate on Plaintiffs' intentional tort claims because they are barred by the WCA, and because Plaintiffs have failed to allege facts so outrageous that they would permit recovery under intentional infliction of emotional distress.  Defendant's motion for summary judgment on Plaintiffs' punitive damages claims and motion to limit Plaintiff Castillo's potential damages are moot.

**WHEREFORE,**

**IT IS ORDERED** that: Defendant's Motion for Summary Judgment on Plaintiff Castillo's Title VII Claims (Doc. 59) is **GRANTED**; Defendant's Motion for Summary Judgment on Plaintiff Ortiz's Title VII Claims (Doc. 60) is **GRANTED**; and Defendant's

Motion for Summary Judgment on Plaintiffs' Intentional Torts Claims (Doc. 61) is **GRANTED**.

      **IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment on Plaintiffs' Punitive Damages Claim (Doc. 62) and Defendant's Motion to Limit Plaintiff Castillo's Potential Damages Recovery (Doc. 76) are **DENIED** as moot.

      **A JUDGMENT CONSISTENT WITH THIS OPINION SHALL ISSUE.**

_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**